# In the United States Court of Federal Claims

No. 20-662C

(E-Filed:  April 22, 2021)[1]

|  |  |  |
|---|---|---|
| KGL FOOD SERVICES WLL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Motions for Judgment on the |
| THE UNITED STATES, | ) | Administrative Record; RCFC 52.1; |
| | ) | Late-is-Late Rule; 48 C.F.R. § 52.212- |
| Defendant, | ) | 1(f)(2)(i);  Systemic  Failure  Exception; |
| | ) | Government Control Exception; |
| and | ) | Prejudice. |
| | ) | |
| ANHAM FZCO, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| INTERMARKETS ALLIANCE | ) | |
| AND USFI, INC., JOINT | ) | |
| VENTURE, | ) | |
| | ) | |
| Intervenor-defendants. | ) | |
| | ) | |

John E. McCarthy, Jr., Washington, DC, for plaintiff.  David C. Hammond, Mark A. Ries, James G. Peyster, Robert J. Sneckenberg, Charles Baek, Jared Engelking, Gabrielle Trujillo,  and William  B. O'Reilly, of counsel.

Daniel S. Herzfeld, Trial Attorney, with whom were Ethan P. Davis, Acting Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial  Litigation Branch, Civil Division,  United States Department of

---

[1]     This opinion was issued under seal on March 29, 2021.  See ECF No. 96.  The parties were invited to identify any competition-sensitive or otherwise protectable information subject to redaction.  The parties' proposed redactions were acceptable to the court.  All redactions are indicated by brackets ([ ]).

Justice, Washington, DC, for defendant. Daniel K. Poling, Gale Furman, R. Zen Schaper, and Cathleen Choromanski, Defense Logistics Agency, of counsel.
Richard P. Rector, Washington, DC, for intervenor-defendant, ANHAM FZCO. Dawn E. Stern, C. Bradford Jorgensen, and Thomas E. Daley, of counsel.

Neil H. O'Donnell, San Francisco, CA, for intervenor-defendant, Intermarkets Alliance and USFI, Inc., Joint Venture. Jeffery M. Chiow, Stephen L. Bacon, and Emily A. Wieser, of counsel.

OPINION

CAMPBELL-SMITH, Judge.

 Plaintiff filed this bid protest to challenge the consideration of an allegedly untimely proposal for the award of a contract with the Defense Logistics Agency (DLA). ECF No. 1 at 1-2 (complaint). Three motions are now before the court: (1) plaintiff's motion for judgment on the administrative record (AR), pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC), ECF No. 56; (2) defendant's cross-motion for judgment on the AR, ECF No. 60; and (3) Intermarkets Alliance and USFI, Inc., JV's cross-motion for judgment on the AR, ECF No. 61.

 In ruling on these motions, the court has considered the following: (1) plaintiff's complaint, ECF No. 1; (2) the AR, ECF Nos. 52-54[2]; (3) plaintiff's motion for judgment on the AR, ECF No. 56; (4) ANHAM FZCO's response to plaintiff's motion for judgment on the AR, ECF No. 57; (5) defendant's response to plaintiff's motion for judgment on the AR, and cross-motion for judgment on the AR, ECF No. 60; (6) Intermarkets' response to plaintiff's motion for judgment on the AR, and cross-motion for judgment on the AR, ECF No. 61; (7) the first supplement to the AR, ECF No. 64; (8) plaintiff's reply in support of its motion for judgment on the AR, and response to defendant's and Intermarkets' motions for judgment on the AR, ECF No. 65; (9) defendant's reply in support of its cross-motion for judgment on the AR, ECF No. 66; (10) Intermarkets' reply in support of its cross-motion for judgment on the AR, ECF No. 68; (11) defendant's supplemental brief, ECF No. 75; (12) plaintiff's response to defendant's supplemental brief, ECF No. 76; (13) Intermarkets' response to defendant's

---

[2] In its order following the initial status conference in this case, the court instructed the parties to use the electronic file stamps generated by the court's case management/electronic case filing (CM/ECF) system for all citations to the administrative record (AR). See ECF No. 13 at 2. The court notes that neither plaintiff nor Intermarkets followed this directive in their briefs, and that a number of the citations actually used in those briefs were incorrect. The failure to follow such straightforward directions compromises the court's ability to efficiently review the issues raised by the parties, and in this case resulted in the court unnecessarily spending considerable time searching the record for correct citations.

supplemental brief, ECF No. 77; and (14) defendant's reply in support of its
supplemental brief, ECF No. 78.

This matter is now fully briefed, and ripe for decision. The court deemed oral
argument unnecessary. The court has considered all of the parties' arguments and
addresses the issues that are pertinent to the court's ruling in this opinion. For the
following reasons, plaintiff's motion for judgment on the AR is **DENIED**, defendant's
cross-motion for judgment on the AR is **GRANTED**, and Intermarkets' motion for
judgment on the AR is **GRANTED**.

I.      Background

This case involves a procurement for "full-line food distribution services
supporting military and other federally funded customers located in Kuwait, Iraq, Syria,
and Jordan pursuant to Solicitation No. SPE300-15-R-0042 [(the solicitation)])."[3]   ECF
No. 1 at 1. In a section titled "Late submissions, modifications, revisions, and
withdrawals of offers," the solicitation stated as follows:

> Any proposal received at the office designated in the solicitation after the
> exact time specified for receipt of offers will not be considered unless it is
> received before award is made and:
>
> It was sent by mail or hand-carried (including delivery by a commercial
> carrier) if it is determined by the Government that the late receipt was due
> primarily to Government mishandling after the receipt at the Government
> installation.
>
> It was sent by U.S. Postal Service Express Mail Next Day Service-Post
> Office to Addressee, not later than 5:00 p.m. at the place of mailing two
> working days prior to the date specified for receipt of proposals.
>
> If there is acceptable evidence to establish that it was received at the activity
> designated for receipt of offers and was under the Government's control prior
> to the time set for receipt of offers, and the Contracting Officer determines
> that accepting the late offer would not unduly delay the procurement; or

---

[3]      The procurement process related to the solicitation has been challenged a number of
times, including twice before this court. See KGL Food Servs. WLL v. United States, Case No.
18-823C; ANHAM FZCO v. United States, Case No. 19-55C. The current dispute, however,
involves a relatively narrow issue related to the time at which revised proposals were submitted.
See generally ECF No. 1. For this reason, the court will recount only the details relevant to
resolving the matter presently at bar.

Any modification or revision of a proposal or response to requested information, including any final proposal revision, is subject to the same conditions indicated above.

Proposals may be withdrawn by written notice (including facsimile) received at any time before award.

ECF No. 52-1 at 259-60.

The DLA first received proposals in response to the solicitation on February 8, 2016, and, following discussions and proposal revisions, awarded the contract to plaintiff on January 12, 2018. See ECF No. 1 at 7 (citing ANHAM FZCO v. United States, 144 Fed. Cl. 697, 704 (2019)). After this initial award decision, protests were filed by various parties before both the Government Accountability Office (GAO) and this court, and the agency took several corrective actions. See id. at 7-11.

On May 1, 2020, in the course of the most recent corrective action, the DLA sent plaintiff a letter opening discussions and setting the deadline for the submission of revised proposals as "3:00 PM ET on May 8, 2020." See ECF No. 54-4 at 51 (letter to plaintiff) (emphasis omitted). On May 5, 2020, the DLA sent plaintiff another letter extending the deadline for the submission of revised to proposals to "3:00 PM Eastern Time (ET) on Friday, May 15, 2020." See id. at 118 (letter to plaintiff) (emphasis omitted).

The DLA extended the deadline an additional time by letter dated May 14, 2020. See id. at 181 (letter to plaintiff). In the May 14, 2020 letter, the DLA set the deadline for the submission of revised proposals at "**3:00 PM Eastern time (ET) on Friday, May 22, 2020**." Id. at 184. The letter closed with the following paragraph:

Please note that with regards to offerors' technical proposals, PDF submissions in lieu of submissions in both Microsoft Word and PDF will be accepted. However, for ease of evaluation DLA Troop Support may require offerors to submit Microsoft Word versions or portions of Microsoft Word versions of the timely PDF submissions after the date and time specified above. If done so, those requests will not be considered discussions or permit proposal revisions. All other instructions concerning submission of proposal revisions remain the same. In order to expeditiously proceed with this acquisition, DLA Troop Support will not entertain any further questions regarding revised proposal submissions. DLA Troop Support appreciates your continued participation in this procurement.

Id.

Plaintiff submitted its revised proposal on May 22, 2020, "two hours prior to the submission deadline." ECF No. 1 at 13; see also ECF No. 54-6 at 345 (email from the contracting officer to plaintiff acknowledging receipt of the revised proposal).  Three other offerors—ANHAM, [ ], and [ ]—also submitted their proposals on time.[4]  See ECF No. 54-4 at 214 (email confirming receipt of ANHAM's revised proposal); ECF No. 54-5 at 285 (email confirming receipt of [ ] revised proposal); ECF No. 54-6 at 416 (email confirming receipt of [ ] revised proposal).  The DLA, however, did not receive Intermarkets' revised proposal prior to the May 22, 2020 deadline.  See ECF No. 54-9 at 1-18 (series of emails dated May 26, 2020, between [ ] and the contracting officer, in which Mr. [ ] submits Intermarkets' revised proposal on its behalf); ECF No. 60 at 14 (defendant stating that "DLA did not receive [Intermarkets'] proposal revisions on May 22, 2020"); ECF No. 61 at 18 (Intermarkets stating that "DLA did not receive the emails from [Intermarkets] which included [its] revised proposal submission").

On May 22, 2020, the contracting officer contacted Robert Jolly with the agency's technology support section to report that one of [ ] emails may be "hung up in the server" because she had not received the email, but "it appears on the sender's side . . . as delivered." ECF No. 53-9 at 47.  In response, Mr. Jolly instructed the contracting officer to submit a report through the appropriate channels to ensure the issue was resolved.  See id. at 46-47.  On May 26, 2020, Mr. Jolly emailed the contracting officer and advised that her "ticket [h]as been assigned to [ ]—the same J64-Directory Services Technician that assisted you with your last delayed/missing email issue." Id. at 45.  The contracting officer responded, noting that the previous email issue had not been resolved, but she worked around the problem because she "was able to change from email submissions to CD." Id.  Due to "COVID policies on base," however, such a resolution was no longer possible.  Id.

On May 26, 2020, Mr. [ ] emailed the contracting officer and reported as follows:

As far as I can tell from my tests this morning, nothing has changed from our end so we are in the same condition as the last time we worked on this issue.

Here is the situation as I understand it, please feel free to correct me or add additional information as appropriate.

--------------------------
There are two addresses that you need to be able to correspond with:

---

[4]    The DLA received most of [ ] proposal, but encountered trouble with one attachment.  See ECF No. 54-5 at 278.  As a result, the contracting officer decided that she would consider the most recent, timely-filed version of the document, dated January 6, 2020.  See ECF No. 54-13 at 51.

Vendors:

[ ]                                    [ ]
natiyeh@img.com.jo                     [ ]

The last time I had the ticket, I wasn't able to find any evidence of either email address getting to you. I did find that emails from [ ] were delivered to our DLA Help Desk so I believe they were not blocked. I never found emails coming from natiyeh@img.com.jo.

Today, I've checked The Exchange Admin Console (EAC) and don't see any quarantined emails from either vendor. I've checked ForcePoint (The DLA Spam Filter) and don't see any blocked emails from either vendor and neither address is blacklisted. I have checked incoming blocked messages to you and neither of these two vendors are on that list. I . . . ran Exchange message traces on both vendors and don't show any emails incoming recently.
--------------------------

I have requested a co-worker to also review this information and to let me know if there is anything I've missed.

Id. at 51-52. Shortly thereafter, Mr. [ ] reported the following result of his co-worker's search, which confirmed his conclusion:

No, you're correct. I'm guessing the emails in question aren't making it to DLA so you don't see them at all, or you might be seeing emails without attachments or something. The user needs to open the ticket with [Defense Information Systems Agency (DISA)] but they need to provide DISA with info that they may have trouble getting except over the phone like date/time sent and subject line. I think it's usually a DKIM failure [ ]. I'm guessing a lot of these companies use anti-SPAM or AV products and the software [ ] to fail DKIM. If it fails, DISA drops the email.

Id. at 51.

Also on May 26, 2020, [ ], who works for a company named [ ], contacted the contracting officer on Intermarkets' behalf. See ECF No. 54-9 at 16. Although the contracting officer received Mr. [ ] test message, she did not receive the emails that he reportedly forwarded, which attached Intermarkets' revised proposal. See id. at 16-17. In the course of this exchange, the contracting officer stated: "[i]t appears that there is an issue with [Intermarkets'] configuration and emails are not hitting our server." Id. at 15. Mr. [ ], thereafter, attempted to send the emails again, and the contracting officer acknowledged receipt of six emails. See id. at 1-14. The contracting officer informed Mr. [ ] that she would "need the time stamped emails or Email confirmation when

initially sent." Id. at 13.  In response, Mr. [ ] suggested that he scan the emails sent by Intermarkets on May 22, 2020.  See id.  On May 27, 2020, Mr. [ ] forwarded screen shots purporting to show that Intermarkets sent its proposal by email on May 22, 2020, before 3:00 p.m., along with a letter indicating that Intermarkets had given him permission to submit its revised proposal.  See ECF No. 54-6 at 337-39, 343.

On May 28, 2020, the contracting officer contacted the offerors, and requested that they send revised proposals through a Department of Defense (DOD) file sharing service. See ECF No. 54-10 at 108-17.  The DLA sent the following directive by email to each of the offerors:

> In reviewing submissions received in response to DLA's most recent negotiation letters, it appears that ongoing internal DLA network issues may have caused disruptions to proposal submission transmissions.  While DLA continues to work to resolve this issue, and due to COVID-19, we are now requesting that your firm's updated technical and business (distribution price only) proposal submissions be submitted through the [DOD] Safe website.
>
> . . .
>
> . . . DLA Troop Support requires that these revisions be submitted by **9:00 AM ET** on Monday, June 1, 2020. . . .
>
> The information submitted by offerors through the [DOD] Safe website should be the same information as submitted through email on or before May 22, 2020.  However, DLA's evaluation will be based on the information received through this website.  In the event DLA does not receive a timely revision through [DOD] Safe by 9:00 AM ET on Monday, June 1, 2020, DLA will consider your most recent proposal revision to be your valid proposal.  Offerors may request that DLA use the information received via email on or before May 22, 2020, however, in doing so, the offeror will run the risk that DLA servers or some other systems issues may have prevented the entire proposal from being received.  **Once again, although the code provided to your firm for this website allows you access for 14 days, proposal submissions uploaded to [DOD] Safe after 9:00 AM ET on Monday, June 1, 2020 will be considered late and will not be evaluated.**
>
> Please also note that it is the offerors' responsibility to ensure timely receipt of proposal submissions.

Id. at 114 (letter to plaintiff) (emphasis in original).

After receiving this email, on May 29, 2020, plaintiff sought to clarify the content of the proposals to be uploaded to the DOD Safe.  See id. at 129.  The DLA responded the same day as follows:  "For clarification purposes, DLA Troop Support's expectation is that the submissions would be the same as those from May 22nd, but offerors may make revisions."  Id. at 132.  Plaintiff then asked that the DLA explain its decision to allow further revisions:

> Can you please provide the rationale for the agency allowing offerors to revise proposals?  The circumstances here appear unusual and suggests that another offeror may have been "late" in submitting its proposal last Friday.  This is particularly concerning in light of the information we provided in our email yesterday regarding a potential PIA violation.  A prompt response would be most appreciated as we need to evaluate our options.

Id.  On May 29, 2020, the contracting officer responded as follows:

> The Government generally does not release source selection sensitive information, including the basis for specific decisions related to a procurement.  As discussed, ongoing internal DLA network issues may have caused disruptions to proposal submissions, consequently an alternative submission method was identified.  In order to ensure all offerors are provided a common cutoff date to respond to this round of negotiations, the June 1 extension was granted equally for all offerors.  Please note, final proposal revisions have not been requested.

Id. at 152.

Following her decision to allow offerors to submit revised proposals through the DOD file-sharing site, the contracting officer continued to work with Mr. [ ] and Mr. Jolly to understand the cause of the submission issues.  See ECF No. 53-9 at 60-61.  On June 8, 2020, the contracting officer sent them the following email:

> Given the recent issues with receipt of proposals and in light of the ongoing litigation with my procurement, I am now being asked for additional explanation from you/J-6 on any circumstances where we would not receive an email/electronic proposal submission?  From what I understand, in my case, one of the offerors has internal "configuration" issues and these are not accepted by our [DOD] server and therefore, never hit our server at all.  In addition, is there always evidence that emails bounce back to the sender?  I think on your side you can see what hits our server and what doesn't, but to others, if they do not apply a read/delivery receipt, they would not know.  Is that correct?

Id. at 67.  Mr. [ ] replied:

> In answer to your question:  "In addition, is there always evidence that emails bounce back to the sender?," the answer is no, often there is no evidence in the form of an NDR or bounce-back.  In fact the "black-hole" effect is a symptom of the sending party's [ ].  The vendor sends an email, DLA never receives it, it never hits our email servers, and the vendor does not receive an indication that their message was not delivered.  Almost always, this is an indication that the messages are being dropped or blocked by DISA's [Enterprise Email Security Gateway Solution (EEMSG)] gateways.

> The solution is for the vendor to work with DISA to resolve [ ].  I have also provided information previously on steps that the vendor can take to resolve their issues and if performed successfully, those steps may resolve the issue without need of interaction with DISA directly.

Id. at 66.  In response to an additional clarifying question from the contracting officer, Mr. [ ] stated that "in 99% of these cases, DISA is blocking communications upstream because the vendors are not compliant with DISA [ ]."  Id. at 64.  He also noted that, in this case, "[t]here is no evidence that any of the emails in question ever reached our DLA system."  Id.

On June 29, 2020, the contracting officer memorialized her decision-making process in a document titled "Memorandum for Record."  ECF No. 54-13 at 50-51.  Therein, she stated as follows:

> The initial closing date for Round 2 of negotiations under the [solicitation] was May 22, 2020.  On May 28, 2020, as a result of ongoing DLA network issues impacting receipt of these revised proposal submissions, the Contracting Officer afforded all offerors an opportunity to submit proposal revisions though June 1, 2020 using [DOD] Safe in lieu of traditional email submissions.

Id. at 50.  In the same memorandum, the contracting officer stated that she would evaluate [ ], [ ], and [ ] revised proposals as submitted on May 22, 2020, and [ ] revised proposals submitted on June 1, 2020.  See id. at 50-51.

On July 15, 2020, the DISA reported that it had located records showing that its server had quarantined the emails sent by Intermarkets on May 22, 2020, "due to the URL reputation" associated with Intermarkets' email address.  ECF No. 64-1 at 1.  The DISA's report confirmed that five of the six emails arrived before 3 p.m. on May 22, 2020, and the sixth arrived at 4:08 p.m.  See id. at 4.  The DISA updated its records at the

request of defendant's counsel in early August 2020 to show that two additional emails were received from Intermarkets on May 22, 2020.  See ECF No. 67 at 2; ECF No. 72.

Plaintiff filed its complaint in this case on June 1, 2020, while the foregoing facts were unfolding.  See ECF No. 1.  Therein, plaintiff alleges that any proposals that were not submitted by the May 22, 2020 deadline should be excluded from consideration, and the DLA's failure to do so would be an abuse of the agency's discretion.[5]  See id. at 15-19.  Plaintiff asks the court to permanently enjoin the DLA "from continuing to include any . . . proposals [received after the May 22, 2020 deadline] in the competition for the [contract] award."  Id. at 20.

II.    Legal Standards

The Tucker Act grants this court jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1).

The court's analysis of a "bid protest proceeds in two steps."  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, the court determines, pursuant to the Administrative Procedure Act standard of review, 5 U.S.C. § 706, whether the "agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law."  Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706)).

Given the considerable discretion allowed contracting officers, the standard of review is "highly deferential."  Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  As the Supreme Court of the United States has explained, the scope of review under the "arbitrary and capricious" standard is narrow.  See

---

[5]    In its complaint, plaintiff also alleged a violation of the Procurement Integrity Act (PIA).  See ECF No. 1 at 13, 17.  The DLA conducted an investigation of the allegations, and found no evidence of such a violation.  See ECF No. 54-13 at 101-05.  Plaintiff does not discuss any PIA violations in its motion for judgment on the AR.  See ECF No. 56.  Accordingly, due to plaintiff's failure to further prosecute the claim, the court will not substantively address the issue in this opinion.

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974).  "A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment,'" and "[t]he court is not empowered to substitute its judgment for that of the agency.'"  Id. (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009) (stating that under highly deferential rational basis review, the court will "sustain an agency action 'evincing rational reasoning and consideration of relevant factors'") (citing Advanced Data Concepts, 216 F.3d at 1058).

If the court finds that the agency acted in error, the court then must determine whether the error was prejudicial.  See Bannum, 404 F.3d at 1351.  To establish prejudice in the pre-award context, a protestor must demonstrate that it has suffered a "non-trivial competitive injury which can be addressed by judicial relief."  Weeks Marine, 575 F.3d at 1362; see also Sys. Applications & Techs., Inc. v. United States, 691 F.3d 1374, 1382 (Fed. Cir. 2012).  This court has held that, under the standard articulated in Weeks Marine, when a protestor "has been wrongfully deprived of the opportunity to fully and fairly compete," such a showing "suffices to establish prejudicial injury on the merits."  Magnum Opus Techs., Inc. v. United States, 94 Fed. Cl. 512, 531 (2010) (citing Distributed Sols., Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir. 2008)).

## III.  Analysis

Under what is commonly referred to as the "late-is-late" rule, a deadline for proposal submissions is strictly construed.  As the United States Court of Appeals for the Federal Circuit has explained:

> When the rules and procedures of a bid process are applied equally to all parties, but one party submits a proposal past the deadline for doing so, the untimely submission becomes a stranger to the process, and is disqualified from the procurement.  A late proposal is tantamount to no proposal at all.

Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1381 (Fed. Cir. 2009).  Pursuant to Federal Acquisition Regulation (FAR) 52.212-1(f)(2)(i):

> Any offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is "late" and will not be considered unless it is received before award is made, the Contracting Officer determines that accepting the late offer would not unduly delay the acquisition; and—
>
>> (A)   If it was transmitted through an electronic commerce method authorized by the solicitation, it was received at the initial point of

11

entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of offers; or

(B)    There is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers; or

(C)    If this solicitation is a request for proposals, it was the only proposal received.

48 C.F.R. § 52.212-1(f)(2)(i).

Here, defendant acknowledges that the contracting officer did not receive Intermarkets' revised proposal by the May 22, 2020 deadline. See ECF 60 at 6. It likewise implicitly accepts that the late-is-late rule applies in this case, but argues that two exceptions to the rule operate to allow consideration of the proposal. See id. Specifically, defendant contends that the DLA may properly consider Intermarkets' proposal because:

(1) systemic failure resulted in DLA not receiving [Intermarkets'] proposal on May 22, 2020; and (2) the government control exception to the late-is-late rule applies because the [DISA] server timely received [Intermarkets'] email submissions on May 22, 2020, but quarantined them without forwarding to DLA's server.

Id. Defendant then argues that, even assuming one of these two exceptions to the late-is-late rule does not apply, plaintiff's claims cannot succeed because it was not prejudiced by the agency's decision to extend the deadline. See id.

A.    The Record Does Not Support the Contracting Officer's Stated Reason for the Extension

Before addressing these arguments, the court reiterates its previous statement that, in a bid protest, "'the focal point for judicial review should be the administrative record already in existence'" at the time of the agency's decision. Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)); see also ECF No. 71 at 3 (August 25, 2020 order). Even when, as here, supplemental documents outside this universe are filed with the court to facilitate effective judicial review, those supplemental documents do not become part of the administrative record, and do not "alter the court's fundamental remit—to determine whether the 'agency's action was arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with [the] law.'"   ECF No. 71 at 4 (quoting <u>Glenn Def. Marine</u>, 720 F.3d at 907).

In accordance with these legal precepts, the court's analysis must center on the information before the contracting officer with regard to the delivery of Intermarket's proposal at the time she decided to extend the May 22, 2020 deadline. As recited above, before she extended the May 22, 2020 deadline, the contracting officer was aware that Intermarkets had unsuccessfully attempted to send its proposal. <u>See</u> ECF No. 53-9 at 45-52 (email exchanges dated May 22, 2020 through May 26, 2020, between the contracting officer and the DLA's technology support section in which Intermarkets' email address is discussed); ECF No. 54-9 at 1-16 (email exchanges dated May 26, 2020, between the contracting officer and Mr. [ ], who was acting on Intermarkets' behalf in attempting to deliver its revised proposal).

It further appears from the record that, prior to the contracting officer's decision to extend the May 22, 2020 deadline, both the technology support personnel and the contracting officer understood the email problem to be with the vendors' email configurations. <u>See</u> ECF No. 53-9 at 47 (contracting officer noting that the problem with receiving [ ] email "appears [to be] on the sender's side"); <u>id.</u> at 52 (Mr. [ ] noting that he didn't find "any quarantined emails," "blocked emails," or "emails incoming recently" from either [ ] or Intermarkets); <u>id.</u> at 51 (Mr. [ ] colleague confirming his assessment, and stating that he believes "the emails in question aren't making it to DLA," advising that "[t]he user needs to open the ticket with DISA," and noting that "a lot of these companies use anti-SPAM or AV products and the software [ ] to fail DKIM. If it fails, DISA drops the email."). The contracting officer even relayed this fact to Mr. [ ], who was attempting to submit Intermarkets' revised proposal on its behalf, when she noted that "[i]t appears that there is an issue with [Intermarkets'] configuration and emails are not hitting our server." ECF No. 54-9 at 15.

This understanding of the problem as originating from the vendor side is corroborated by evidence that post-dates the contracting officer's decision to extend the May 22, 2020 deadline. <u>See</u> ECF No. 53-9 at 67 (contracting officer stating, on June 8, 2020, that "[f]rom what I understand, in my case, one of the offerors has internal 'configuration' issues and these are not accepted by our [DOD] server, and therefore, never hit our server at all"); <u>id.</u> at 66 (Mr. [ ] advising the contracting officer that "[t]he solution is for the vendor to work with DISA to resolve their email configuration issues"); <u>id.</u> at 64 (Mr. [ ] stating that "in 99% of these cases, DISA is blocking communications upstream because the vendors are not compliant with DISA security requirements in their email server configurations," and noting that in this case, "[t]here is no evidence that any of the emails in question ever reached our DLA system").

The record evidence of the contracting officer's understanding of the problem is at odds with her explanation to the offerors for her decision to extend the deadline. In her May 28, 2020 email to the offerors extending the deadline to June 1, 2020, she stated:

> In reviewing submissions received in response to DLA's most recent negotiation letters, it appears that ongoing internal DLA network issues may have caused disruptions to proposal submission transmissions. While DLA continues to work to resolve this issue, and due to COVID-19, we are now requesting that your firm's updated technical and business (distribution price only) proposal submissions be submitted through the [DOD] Safe website.

ECF No. 54-10 at 114 (letter to plaintiff). On May 29, 2020, in response to plaintiff's questions about the reason for the extension, the contracting officer explained that "ongoing internal DLA network issues may have caused disruptions to proposal submissions, consequently an alternative submission method was identified." Id. at 152. And in her June 29, 2020 memorandum memorializing the decision to extend the deadline, the contracting officer wrote that "[o]n May 28, 2020, as a result of ongoing DLA network issues impacting receipt of these revised proposal submissions, the Contracting Officer afforded all offerors an opportunity to submit proposal revisions though June 1, 2020 using [DOD] Safe in lieu of traditional email submissions." ECF No. 54-13 at 50.

The record simply does not support these explanations. The parties have identified nothing in the record indicating that the problem was with the DLA's network, or that the DLA was "work[ing] to resolve this issue." ECF No. 54-10 at 144. To the contrary, as discussed above, the record shows that both the contracting officer and the technology support personnel believed the problem to be with the vendors' email configurations. Moreover, the technology support personnel specifically and repeatedly told the contracting officer that in order to address the problem, the vendors needed to contact DISA—there is no indication that the DLA was working to fix the problem.

## B.   Exceptions to the Late-Is-Late Rule Do Not Apply

In light of the information before the contracting officer at the time she extended the May 22, 2020 deadline, neither of the exceptions to the late-is-late rule identified by defendant is applicable here.

### 1.   Systemic Failure Exception

This court has explained that the systemic failure exception "stems from the agency's obligation to have procedures in place to reasonably safeguard proposals or quotations actually received and to give them fair consideration." Fed. Acquisition Servs. Team, LLC v. United States, 124 Fed. Cl. 690, 707 (2016) (quotation marks and

citation omitted).  "The exception generally applies where the loss was not an isolated act of negligence, but was the result of a systemic failure resulting in <u>multiple</u> or <u>repetitive</u> instances of lost information."  <u>Id.</u> (quotations omitted) (emphasis in original). According to defendant "[t]he systemic failure exception applies here because multiple offerors (including [Intermarkets]) encountered systemic problems repeatedly in sending emails to DLA."  ECF No. 60 at 21.

The record in this case, however, does not fit within the contours of this exception. There simply is no indication of any systemic failure at all, and certainly not a systemic failure of which the contracting officer was aware at the time she extended the May 22, 2020 deadline.  To the contrary, the DISA system seems to have functioned as expected. As discussed above, the record indicates that the contracting officer understood the problem to be with the vendors' email configurations, and the technology support personnel informed her that the emails were not quarantined, blocked, or even received by the DLA, but likely were dropped by the DISA server.  <u>See</u> ECF No. 53-9 at 47 (contracting officer noting that the problem with receiving [ ] email "appears to be on the sender's side"); <u>id.</u> at 52 (Mr. [ ] noting that he didn't find "any quarantined emails," "blocked emails," or "emails incoming recently" from either [ ] or Intermarkets); <u>id.</u> at 51 (Mr. [ ] colleague confirming his assessment, and stating that he believes "the emails in question aren't making it to DLA," advising that "[t]he user needs to open the ticket with DISA," and noting that "a lot of these companies use anti-SPAM or AV products and the software [ ] to fail DKIM.  If it fails, DISA drops the email.").

The fact that the contracting officer, in her email to offerors extending the May 22, 2020 deadline, characterized the problem as "ongoing internal DLA network issues," that DLA was "work[ing] to resolve," does not make it so.  ECF No. 54-10 at 114.  The parties have not identified any evidence in the record—that was before the contracting officer at the time she wrote that email—to support her assertion that the problem was with the DLA's network, or that any system involved did not operate as intended.

      2.     Government Control Exception

The government control exception is likewise inapplicable here.  The solicitation provided that:

> Any proposal received at the office designated in the solicitation after the exact time specified for receipt of offers will not be considered unless it is received before award is made and:
>
> . . .
>
> If there is acceptable evidence to establish that it was received at the activity designated for receipt of offers and was under the Government's control prior

to the time set for receipt of offers, and the Contracting Officer determines
that accepting the late offer would not unduly delay the procurement . . . .

ECF No. 52-1 at 259-60.  This court has previously found that the government control
exception applies when:  "(i) the offer is received before the award is made; (ii)
consideration of the offer would not unduly delay the acquisition; (iii) the offer was
'received at the Government installation designated for receipt of offers;' and (iv) the
offer 'was under the Government's control prior to the time set for receipt of offers.'"
Insight Sys. Corp. v. United States, 110 Fed. Cl. 564, 576 (2013).

Defendant argues that each of these factors is met with regard to Intermarkets'
proposal.  See ECF No. 60 at 23-25.  The fundamental flaw with this position, however,
is that it is dependent on documents that are not part of the AR.  Defendant has
supplemented the AR twice in this case, see ECF No. 64, ECF No. 72, both times with
documents that did not exist at the time the contracting officer made the decision
challenged by plaintiff, see ECF No. 71 at 4-5 (order stating that defendant's
supplemental documents were being accepted to provide context, but not as part of the
AR).  Both defendant and Intermarkets repeatedly rely on these supplements to show that
the DISA server received Intermarkets' revised proposal.  See ECF No. 66 at 10, 13, 14
n.4; ECF No. 68 at 7 & n.1, 8, 12, 13; ECF No. 75 at 2, 3, 5; ECF No. 77 at 1-7; ECF No.
78 at 1, 2, 5.

According to defendant, the reliance on the supplemental documents is
permissible because "this [c]ourt has repeatedly relied on supplemental documents to
ascertain whether the government control exception to the late-is-late rule applied in a
particular procurement."  ECF No. 78 (citing Fed. Acquisition Serv. Team, 124 Fed. Cl.
at 697-700, and Insight Sys. Corp., 110 Fed. Cl. at 572).  The extent to which the
decisions cited by defendant actually relied on supplementary material is not entirely
clear.  But even if other decisions from this court have relied upon supplemental material
in the bid protest context, the court declines to do so in this case.  See Axiom, 564 F.3d at
1379 (Fed. Cir. 2009) (quoting Camp, 411 U.S. at 142) (noting that the "'the focal point
for judicial review should be the administrative record already in existence'" at the time
of the agency's decision).

Considering only the documents that were before the contracting officer at the
time she made the challenged decision, and assuming that the first two factors articulated
in Insight are satisfied, the AR in this case does not support a finding that the third or
fourth factors could have been met at the time the contracting officer made the relevant
decision.  Prior to the time she announced her decision to extend the May 22, 2020
deadline, the DLA's technology support personnel told the contracting officer that
Intermarkets' emails were not quarantined, blocked, or even received by the DLA, but
likely were dropped by the DISA server as a result of improper email configurations on
the vendor's side.  See ECF No. 53-9 at 52 (Mr. [ ] noting that he didn't find "any

quarantined emails," "blocked emails," or "emails incoming recently" from either [ ] or Intermarkets); id. at 51 (Mr. [ ] colleague confirming his assessment, and stating that he believes "the emails in question aren't making it to DLA," advising that "[t]he user needs to open the ticket with DISA," and noting that "a lot of these companies use anti-SPAM or AV products and the software [ ] to fail DKIM. If it fails, DISA drops the email."). And the contracting officer apparently understood this assessment because she relayed this information to Mr. [ ], noting that "[i]t appears that there is an issue with [Intermarkets'] configuration and emails are not hitting our server." ECF No. 54-9 at 15.

Even if the DISA system technically had control of Intermarkets' proposal on May 22, 2020, and even if such control is sufficient to invoke the government control exception, there is no indication in the record that the contracting officer was aware of that fact at the time she decided to extend the May 22, 2020 deadline. At most, the contracting officer had before her the screen shots provided by Mr. [ ] which purported to show that Intermarkets had sent emails on May 22, 2020. See ECF No. 54-6 at 337-39. Those screenshots alone demonstrate neither that the DLA or the DISA server had received the messages, nor what information the messages contained. In fact, it was not until July 15, 2020—nearly seven weeks after the contracting officer extended the May 22, 2020 deadline—that the DISA reported that it had located evidence of six quarantined emails sent by Intermarkets on May 22, 2020.[6] See ECF No. 58; ECF No. 64.

Thus, notwithstanding what later-discovered evidence may support, there was no basis on which the contracting officer could have applied the government control exception at the time she extended the May 22, 2020 deadline. And because this court's inquiry is limited to considering the universe of information available to the contracting officer at the time the challenged decision was made, allowing defendant to apply the government control exception based on later-discovered facts would amount to an impermissible post hoc justification for the extension decision.[7] See, e.g., Citizens to

---

[6]     Both defendant and Intermarkets acknowledge that the contracting officer did not know that Intermarkets' revised proposal had been received by the DISA server at the time she extended the May 22, 2020 deadline. See ECF No. 78 at 2 (defendant stating that the contracting officer acted on what she "surmised at the time," which was later confirmed by the DISA search); ECF No. 77 at 4-5 (stating that "the evidence the contracting officer had before her on May 28 when she extended the deadline, . . . strongly suggested that the emails containing [Intermarkets'] revised proposal were timely received" by the DISA's server). Suggestions and assumptions may be reason to further investigate a problem before proceeding, but are an insufficient basis for the court to conclude that the contracting officer's decision was rational.

[7]     Intermarkets argues that plaintiff waived its right to object to the deadline extension because plaintiff did not object to an earlier deadline extension. See ECF No. 61 at 30-32 (citing Blue & Gold Fleet, L.P., 492 F.3d 1308, 1313 (Fed. Cir. 2007)). The court is unpersuaded the waiver rule from Blue & Gold applies in this case. Intermarkets has presented no authority for

Preserve Overton Park, 401 U.S. at 419 (noting that post hoc rationalizations "have traditionally been found to be an inadequate basis for review"); Jacobs Tech., Inc. v. United States, 100 Fed. Cl. 198, 208 (2011) ("The Supreme Court has held that post hoc rationalizations that are part of the administrative record should not be relied upon as the basis for reviewing an agency's decision.") (citations omitted); CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 376 (2010) (finding that the court must review the record "as of the time of the decision," and that "[a]ny post hoc rationales an agency provides for its decision are not to be considered") (citations omitted).

Accordingly, the court finds that the contracting officer's decision to extend the May 22, 2020 deadline to account for disruption caused by "ongoing internal DLA network issues," ECF No. 54-10 at 114, was not based on the facts before her, and was therefore arbitrary, capricious, and an abuse of her discretion. Moreover, neither of the exceptions to the late-is-late rule identified by defendant apply here.

C.     Plaintiff Was Not Prejudiced by the Contracting Officer's Error

Having found an error in the procurement process, the court must now consider whether that error was prejudicial to plaintiff. See Bannum, 404 F.3d at 1351. As previously noted, to establish prejudice in the pre-award context, a protestor must demonstrate that it has suffered a "non-trivial competitive injury which can be addressed by judicial relief." Weeks Marine, 575 F.3d at 1362; see also Sys. Applications, 691 F.3d at 1382. This court has held that, under the standard articulated in Weeks Marine, when a protestor "has been wrongfully deprived of the opportunity to fully and fairly compete," such a showing "suffices to establish prejudicial injury on the merits." Magnum Opus, 94 Fed. Cl. at 531 (citing Distributed Sols., 539 F.3d at 1345).

Here, plaintiff asserts a two-part argument that the contracting officer's decision to extend the May 22, 2020 deadline to June 1, 2020, caused it to suffer non-trivial competitive injury. Plaintiff argues that Intermarkets "should not be permitted to continue as a participant in the . . . procurement" as a result of its late proposal, and because the DLA extended the submission deadline instead of eliminating Intermarkets from the competition, plaintiff is now forced "to compete against [ ] other offerors, instead of [ ]," a circumstance that "materially reduces [plaintiff's] prospect for award of the . . . contract," resulting in competitive prejudice. ECF No. 56 at 30.

The court is unpersuaded—on the current record—that the predicate for plaintiff's position is correct. In an attempt to demonstrate that Intermarkets' revised proposal should be excluded, plaintiff cites to a line of GAO cases purporting to show that "the submission of a proposal revision that includes material changes from prior versions of

_____

the proposition that plaintiff's failure to object to an earlier extension decision has any bearing on its ability to object to a later extension decision that was based on a new set of facts.

the proposal serves to revoke and replace all prior proposal submissions in the procurement." Id. at 31. According to plaintiff, Intermarkets' late proposal contained material changes, which implicates this rule and prevents the DLA from considering Intermarkets' earlier-filed version of its proposal. See id. at 32. If the DLA is unable to consider that earlier-filed version, the argument goes, Intermarkets would have no viable proposal for consideration, and would have to be eliminated from competition. See id. Setting aside the fact that GAO decisions are not binding on this court, see Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011) (citing Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989)), the facts of this case do not line up with the rule plaintiff seeks to establish with this authority. Even assuming that the changes in Intermarkets' revised proposal qualify as material, when plaintiff is arguing that the proposal should have been rejected as late, it is illogical for plaintiff to also argue that the revised proposal has any legal effect on the previous version of the proposal. See Labatt Food Serv., 577 F.3d at 1381 ("A late proposal is tantamount to no proposal at all.").

Throughout its briefs, plaintiff's prejudice argument relies heavily on this court's decision in National Air Cargo Group, Inc. v. United States, 126 Fed. Cl. 281, 295 (2016). In National Air Cargo, after receiving one of the initial five awards under an indefinite delivery/indefinite quantity solicitation, which entitled it to compete with the other awardees for task orders, plaintiff challenged a sixth award on the basis that, in making the sixth award, the agency "violated terms of the solicitation limiting awardees," violated applicable statutes and regulations, and acted irrationally given the sixth awardee's past performance record. See id. at 284. The defendant challenged the plaintiff's standing, and moved to dismiss for lack of jurisdiction pursuant to RCFC 12(b)(1). See id. at 284-85. The court concluded that plaintiff's allegation—that it suffered a non-trivial competitive injury as a result of increased competition—was sufficient to show prejudice for purposes of establishing standing, and denied the motion to dismiss. See id. at 295.

The court is unable to evaluate the application of this case to the facts at bar, however, because the court's conclusion in National Air Cargo was premised on the court's finding that the challenged decision in that case resulted in increased competition. See id. In this case, however, the parties have not presented sufficient argument or record citation to support a finding as to whether the agency would be required to eliminate Intermarkets from competition, or if the agency would be permitted to evaluate the most recent, timely-submitted version of Intermarkets' proposal.[8] Plaintiff acknowledges as

---

[8]     The court notes that there is some indication in the record that the contracting officer would consider the most recent, timely-submitted version of an offeror's proposal in such a circumstance. In her May 28, 2020 letter, the contracting officer stated that, "[i]n the event DLA does not receive a timely revision through [DOD] Safe by 9:00 AM ET on Monday, June 1, 2020, DLA will consider your most recent proposal revision to be your valid proposal." ECF

much in its reply when it notes that "it is arguably premature for the [c]ourt to decide the matter," because the contracting officer "has not yet announced a position on the issue." ECF No. 65 at 29.  In plaintiff's view, however, "the [c]ourt need not even definitively answer this question" because "the [c]ourt need only recognize the possibility that [Intermarkets] might be excluded to find that [plaintiff] has been sufficiently prejudiced here."  Id.

The court disagrees.  Plaintiff's claim to a non-trivial competitive injury, and therefore prejudice, is premised on its assertion that it is being unfairly required to compete against Intermarkets.  The court simply cannot decide this issue on the record before it.  And without a finding that Intermarkets unfairly remains in the competition, plaintiff's claim that it has been prejudiced is unsupported.

Moreover, the contracting officer's decision to extend the May 22, 2020 deadline to June 1, 2020, was applied equally to all offerors.  See ECF No. 54-10 at 108-17. Plaintiff argues that "[h]aving complied with the [c]ontracting [o]fficer's instruction, [plaintiff] garnered no benefit from the improper deadline extension, while multiple competitors used the unlawful extension to their benefit."  ECF No. 65 at 28.  But the fact that plaintiff did not take the opportunity to revise or re-submit its proposal while other offerors did so, does not necessarily render the extension unfair.

For these reasons, the court finds that plaintiff has failed to carry its burden to demonstrate that it has suffered a non-trivial competitive injury, and therefore, has failed to show that it was prejudiced by the contracting officer's procurement error.

### D.    Permanent Injunctive Relief Is Not Warranted

Plaintiff has not succeeded on the merits of its protest.  "Because proving success on the merits is a necessary element for a permanent injunction," Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 999 (Fed. Cir. 2018), no injunctive relief is warranted in this case, and this protest must be dismissed.

### IV.    Conclusion

Accordingly, for the foregoing reasons:

(1)    Plaintiff's motion for judgment on the AR, ECF No. 56, is **DENIED**;

_____

No. 54-10 at 114.  In addition, the DLA determined that, because it had not received one part of [ ] revised proposal, its most-recent version of the missing part "will stand as the basis for negotiation during the next round."  See ECF No. 54-13 at 51.  These statements do not, however, definitively resolve the issue with regard to Intermarkets' submissions.

(2)     Defendant's cross-motion for judgment on the AR, ECF No. 60, is **GRANTED**;

(3)     Intermarkets' cross-motion for judgment on the AR, ECF No. 61, is **GRANTED**;

(4)     The clerk's office is directed to **ENTER** final judgment, **DISMISSING** plaintiff's complaint, with prejudice; and

(5)     On or before **April 14, 2021**, the parties are directed to **CONFER** and **FILE** a **notice** informing the court as to whether any redactions are required before the court makes this opinion publicly available, and if so, attaching an agreed-upon proposed redacted version of the opinion.

IT IS SO ORDERED.

s/Patricia Campbell-Smith
PATRICIA CAMPBELL-SMITH
Judge